692 So.2d 1271 (1997)
James Roy GALLIEN, et ux., Plaintiffs-Appellees,
v.
STAPLETON CORPORATION, et al., Defendants-Appellants.
No. 96-1197.
Court of Appeal of Louisiana, Third Circuit.
March 26, 1997.
Writ Granted June 13, 1997.
*1272 Dee A. U. Hawthorne, Natchitoches, for James Roy Gallien, et ux.
Howard Battle Gist, III, Alexandria, for Stapleton Corporation, et al.
Before DECUIR, AMY and SULLIVAN, JJ.
AMY, Judge.
This is an appeal from the trial court's grant of plaintiffs' motion for a judgment notwithstanding the verdict on the issues of fault and quantum. We reverse the trial court's judgment and render judgment in favor of the defendant, Stapleton Corporation.

DISCUSSION OF THE RECORD
On September 13, 1989, James Gallien, a part-time journeyman electrician, was injured when a wooden ladder he was working on broke. At the time of the accident, Gallien was performing electrical work on the deck of a new platform at Lott Oil Company. The ladder in question was a 10-foot type II wooden commercial ladder manufactured by the defendant, Stapleton Corporation. The platform Gallien was using the ladder on was a grated surface with diamond shaped openings[1] as well as several larger holes apparently the result of prior use. After making several trips up and down the ladder, the left back rail or leg of the ladder failed near the bottom causing Gallien to lose his balance and jump from the falling ladder. As a result of this fall, Gallien suffered a comminuted *1273 fracture of his left heel and a laceration of his left forearm.
Plaintiffs, Gallien and his wife, Patricia, filed suit against the manufacturer pursuant to the Louisiana Products Liability Act, La. R.S. 9:2800.51, et seq., seeking damages caused by the allegedly defective and unreasonably dangerous ladder, including a claim for loss of consortium filed on behalf of Patricia Gallien. Louisiana Employees Safety Association, a worker's compensation insurer for Shop-A-Lott, Inc., filed a petition of intervention for monies paid to, or on behalf of, Gallien, resulting from the accident at Lott Oil Company. The action in intervention was dismissed on August 23, 1993.
A jury trial on the merits began on October 16, 1995, and continued through October 19, 1995. After consideration of the evidence and deliberation, the jury returned its responses to the jury interrogatories and completed a special jury verdict form. From these responses, the trial judge rendered judgment for Gallien and against Stapleton Corporation in the sum of $57,243.50, together with legal interest from the date of judicial demand until paid, subject to a reduction of 75%, the fault attributed to Gallien by the jury. Patricia Gallien's claim for loss of consortium was rejected.
Both parties filed a motion for a judgment notwithstanding the verdict (JNOV). Gallien additionally filed an alternative motion for new trial in the instance that his motion for JNOV was denied. These motions were heard and considered together on November 15, 1995. The trial judge denied Stapleton Corporation's motion for JNOV, granted Gallien's motion for JNOV and entered judgment for Gallien against Stapleton in the sum of $636,386.50 and for $35,000.00 on Patricia Gallien's loss of consortium claim. Additionally, the trial judge granted Gallien's alternative motion for a new trial should this court reverse the judgment granting Gallien's motion for JNOV.
Stapleton Corporation appeals from this ruling, assigning the following assignments of error: (1) the trial judge was clearly wrong in granting a JNOV to Gallien; (2) the trial judge erred with its instructions to the jury and the special jury verdict form submitted to the jury for deliberation or, alternatively, the jury erred in apportioning any fault to Stapleton Corporation; and, (3) the trial judge was clearly excessive in his award of damages to Gallien.

LAW

The JNOV
Stapleton Corporation's first assignment is divided into three separate contentions. Stapleton Corporation argues that (1) the trial court was clearly wrong to grant Gallien's motion for a JNOV; (2) the trial court was clearly wrong to deny Stapleton Corporation's motion for a JNOV; or, alternatively, (3) the trial court abused its discretion to grant Gallien's alternative motion for a new trial.
Louisiana Code of Civil Procedure article 1811 provides for the post-trial relief of a judgment notwithstanding the verdict. However, the grounds on which this motion shall be granted are judicial in nature. The Louisiana Supreme Court has established the criteria to be employed by the trial court when determining if a JNOV should be granted. Scott v. Hospital Serv. Dist. No. 1, 496 So.2d 270 (La.1986). The test for granting a JNOV and the appropriate standard of appellate review is as follows:
A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. (Citation omitted). In making this determination, the court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should *1274 be resolved in favor of the non-moving party.
In reviewing a JNOV, the appellate court must first determine if the trial court erred in granting the JNOV. This is done by using the aforementioned criteria just as the trial judge does in deciding whether to grant the motion or not, i.e. do the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict? If the answer to that question is in the affirmative, then the trial judge was correct in granting the motion. If, however, reasonable men in the exercise of impartial judgment might reach a different conclusion, then it was error to grant the motion and the jury verdict should be reinstated.
Anderson v. New Orleans Pub. Serv., Inc., 583 So.2d 829, 832 (La.1991).
In Louisiana, the exclusive remedy available in suits against the manufacturer of a product for damages allegedly caused by that product is the Louisiana Products Liability Act, La.R.S. 9:2800.51, et seq. If a plaintiff is unable to prove by a preponderance of the evidence the existence of a claim under this Act, he is without a civil remedy against such manufacturer.
La.R.S. 9:2800.54 provides, in pertinent part:
A. The manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity.
La.R.S. 9:2800.55 provides:
A product is unreasonably dangerous in construction or composition if, at the time the product left its manufacturer's control, the product deviated in a material way from the manufacturer's specifications or performance standards for the product or from otherwise identical products manufactured by the same manufacturer.
La.R.S. 9:2800.56 provides:
A product is unreasonably dangerous in design if, at the time the product left its manufacturer's control:
(1) There existed an alternative design for the product that was capable of preventing the claimant's damage; and
(2) The likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product. An adequate warning about a product shall be considered in evaluating the likelihood of damage when the manufacturer has used reasonable care to provide the adequate warning to users and handlers of the product.
The trial judge, when probed by defense counsel concerning his reasoning for granting Gallien's JNOV, stated:
[A]pparently they [Stapleton Corporation] got a bad piece of wood in the leg. Because the ladders apparently are of a good design. But Mr. Gallien put this ladder on a platform and used it in the normal way it's supposed to be used, and the eyewitness... both eyewitnesses, himself and the disinterested third party, said it broke purely and simply.
* * * * * *
And all this business about it going through the grate was nothing but a red herring that apparently was a good one, because apparently it confused the jury and they came up and said he was seventyfive percent (75%) at fault on a ladder that could not physically ... impossible to go through that grate unless you take a piece of grate off and get it at the proper angle to push it up on it.
* * * * * *
I mean, it could have gone in a hole if you'd get it at the right angle. But if it would have been at the right angle he couldn't have stood on it anyway.
* * * * * * *1275 Yeah, there's nothing wrong with the ladder as far as its design. They just bought a bad piece of wood to make the leg out of.
Unlike the trial judge, we conclude that the possibility that the back ladder rail slipped into one of the diamond shaped openings or one of the larger holes in the grating is of great importance. In arriving at its conclusion that the ladder could, and most probably did, slip into one of these openings, the jury heard the following testimony.
Gallien testified that he personally purchased the ladder from a local hardware store. This acquisition occurred on June 5, 1989, approximately three months prior to the accident. Gallien testified that, besides himself, he had witnessed one other person using the ladder during this period. Gallien further testified that on the date of the accident he had worked on the ladder for approximately forty-five minutes and had repositioned the ladder on the platform several times. Gallien reported that, every time he positioned the ladder on the platform, he aligned the left legs on the I-beam for better support. Gallien also reported that he was aware of the openings and larger holes in the grating and that he was sure the ladder had not been placed closer than four to six inches to one of the larger holes. However, after further questioning, he admitted that he could have placed the ladder as close as two inches from a larger hole, a hole which all parties freely admit was large enough for the ladder rail to fit through.
Randy Jones testified that, at the time of the accident, he was in a nearby trench painting the pipes that ran from the loading platform to the tank farm. During Jones' testimony, the following colloquy occurred:
Q. Tell me what happened that day?
A. I was painting, and I ran out of a bucket of paint. So I got up to go get another bucket of paint. And I was under the pipes painting, so when I stood up I looked up at Mr. Gallien. And he was measuring up to the roof of the loading dock. And as I looked up and I was picking up my can the ladder broke and I... he fell.
* * * * * *
Q. Did you have occasion to look at the ladder?
A. First I looked to see where it had broke. Then I looked to see had it gone through the grate itself. But it hadn't.
Q. How did you know that?
A. It wasn't ... first of all, it wouldn't fit through the grate. And it wasn't smashed or broken or anything, it was just broke up higher. You could tell that it hadn't went through the grate.
Q. How do you know it couldn't go through the grate?
A. We tried it. Before he got on the ladder we tried it. We set the front legs and the back legs to make sure that the ladder was ... it was stable, that it wouldn't go through the grate.
* * * * * *
Q. And you tested the leg to see if it would actually go through the diamonds?
A. Yes.
Q. And as it was opened it wouldn't do that [sic]?
A. No.
However, when questioned regarding the larger holes found in the grating, Jones testified that he had no recollection of the existence of such holes. Furthermore, when specifically asked if he had tested the ladder to see if the ladder rail could fit into the larger holes, Jones responded: "No, only the small grated area."
Additionally, several witnesses presented testimony concerning the appearance of the missing section of the broken ladder rail. As previously mentioned, Jones testified that the now missing portion[2] of the ladder was not damaged which prompted him to conclude that the rail had not gone through an opening in the grating. Since he was unable to *1276 examine the ladder on the day of the accident, Gallien testified that he and his son, Danny Gallien, went to Lott Oil a couple of weeks later to examine the broken ladder to discover what caused the ladder to fail. Actually, in subsequent testimony Gallien testified that he did not know the rail had broken at the time of the accident. During his testimony, Gallien admitted that, once he discovered that the ladder rail had broken, he was concerned that the rail "may have went through one of those small diamond shaped holes." However, after inspecting the ladder with the now missing section still attached, Gallien stated that he did not discover any crimp marks and that he was "more or less, satisfied ... that it hadn't went through one of the grates."
In addition to the above lay witness testimony, several experts testified at trial about what caused the ladder rail to fail. First, we note that all experts agreed on several things: (1) the ladder met or surpassed the American National Standards Institute (ANSI) requirements for a type II wooden commercial ladder; (2) the ladder experienced a bending failure; (3) without the missing piece of ladder and the amount of time that had passed before the ladder was examined, it is impossible to know what really caused the ladder rail to fail; and, (4) there are four possibilities of what caused the bending failure of the ladder rail. The experts' testimony varied only as to which hypothetical situation each believed was the most probable cause of the bending failure of the ladder rail. The four possibilities are: (1) the ladder was abused or mistreated;[3] (2) the ladder rail became entrapped in one of the small grates or went through the small grates and, as a result, bent over and broke; (3) the ladder rail went into one of the larger holes in the grate causing the ladder to tip and break; or (4) the ladder experienced some kind of internal problem or defect.
After testing the ladder in a laboratory setting, Dr. Duane Lyon, a wood technologist, testified to the following: (1) the ladder met ANSI standards for ladders of its kind; (2) there was no evidence of compression wood[4] identifiable by the naked eye; (3) grain orientation (cross grain and slope of grain) was acceptable; (4) no evidence of decay was present; (5) density of wood was adequate; (6) no evidence of knots; (7) no wane[5] in the ladder; and (8) no evidence of a compression failure.[6] Dr. Lyon, through a process of elimination, concluded that the most probable explanation for the accident was that the ladder suffered a compression break. Dr. Lyon defined a compression break as:
[A] failure in wood that is completely unrelated to compression wood.... [A] compression break is an actual failure across the grain in the piece of wood that occurs due to some trauma.. that has occurred either in the living tree or in the process of cutting that tree down[.] ... [I]t results in a cross break across the grain.
Dr. Lyon concluded that the ladder rail most probably contained wood with a compression break which created "[a] point of weakness that ... cause[d] a sudden, unexpected, brash type failure." In reaching this conclusion, Dr. Lyon eliminated the possibility that the rail slipped into one of the smaller openings in the grating or one of the larger holes as follows: (1) the ladder did not slip into one of the smaller openings because in an open position the ladder could not fit; and (2) the ladder did not slip through one of the larger openings in the grating because only a small percentage of the load on the ladder rests on the back legs requiring the break to occur *1277 at the place that the ladder rail would be pinched or came in contact with the metal grate, not at some alternate location as where this ladder broke. Additionally, Dr. Lyon ruled out the possibility that the ladder rail slipped through one of the larger openings because the rail was not pinched in the grating until the ladder was 22 ½° from horizontal, making it impossible for Gallien to jump and land where he did. However, these findings must be viewed with the following facts in mind: (1) Dr. Lyon never visited the sight of the accident; (2) his conclusions were made without regard as to where the ladder was placed on the platform; and, (3) his results require that Gallien remained on the ladder until the time of the break or failure.[7]
Philip W. Beard, a structural engineer, like Dr. Lyon, ultimately concluded that the failure was caused by a defect in the wood. Beard constructed an exemplary ladder for use to determine what happened on the day of Gallien's accident. First, Beard testified that the ladder would not fit into the smaller diamond shaped openings. Next, Beard ruled out the possibility of the ladder slipping into one of the larger holes because, when he placed the exemplary ladder on the platform in the location that Gallien provided, he discovered that a vertical pipeline coming through the grating blocked the ladder from reaching the larger hole without the whole ladder being lifted and moved. Additionally, even assuming the ladder did slip into this larger hole, like Dr. Lyon, he noted that Gallien would not be able to remain on the ladder until the point the ladder became wedged in the grating. On re-examination, Beard testified that the metal bracket that remained attached to the rail foreclosed the possibility that the ladder failed because the rail had slipped into an opening in the grating. Beard noted that this metal bracket would dictate how the ladder would fall and where the break would occur. Also, Beard calculated that the ladder would need to rotate approximately 25° to enable the back edge of the ladder to reach the back edge of the larger hole, which was blocked by a protruding pipe, if the ladder did not remain perfectly aligned with the I-beam.
Dr. Paul Winistorfer, a wood technologist, testified that after examining the ladder, he was sure the rail suffered a bending failure. Dr. Winistorfer testified that if a wood suffers a compression failure, it does not buckle, "[i]t literally just kinda squashes down a little bit. The cells kinda break at a real minute level." Dr. Winistorfer further testified that the wood itself left a record of what occurred. While examining a blown-up photograph of the broken area of the ladder rail, Dr. Winistorfer stated:
[I]t is a bending failure. Which means here's the bottom part of this leg, the bottom part of that leg is forced outward... It did not fail in compression by it being pushed down on. It did not fail in tension really, pure tension, by it being pulled straight apart. But when I do bend a piece of wood ... here I am bending this leg, several things remained, the washer is over here on the table, and you see the washer here. It failed right here. Alright, so when it failed out, it bent out, this washer gets bent out. There's there [sic] for all of us to see.... Now there's more evidence of a bending failure.... [In a bending break,] the wood breaks, what we say, in a characteristic fashion where the bottom fibers where I'm bending it are trying to stretch. They're trying to get shorter ... You can get up and look if you want, but there's an area on the top of this rail where there is two and half (2-1/2) inches of wood pulled out of this side of the rail in tension.
Dr. Winistorfer concluded that a ladder does not suffer a bending failure of this kind unless the bottom leg is held or fixed in a position then tipped over. Dr. Winistorfer concluded that, since he was able to slip the ladder rail into one of the smaller diamond shaped openings by turning the ladder approximately two degrees, the ladder failed when pinched in one of those openings. However, we note that Dr. Winistorfer never attempted to place the ladder rail *1278 through one of the smaller diamond shaped openings with the ladder in an open position. Dr. Winistorfer also admitted that another possibility would be that the ladder slipped into one of the larger holes, but he believed that the failure was more likely caused by the rail slipping into one of the smaller openings because of the angle the ladder must tip before making contact with the grating. Ultimately, Dr. Winistorfer concluded that the ladder was not defective in manufacture, construction, or composition because a defective ladder would not mysteriously break after three months of prior use when someone walks up it and loads it in compression. Dr. Winistorfer stated: "It just doesn't mysteriously break. It can't. It doesn't."
Dr. Ed Burdette, a structural engineer, testified that the ladder's break was an unusual break. Dr. Burdette concluded that the ladder did not simply fail because a back leg would not break outward, in the manner evidenced by the remaining pieces of the ladder, from the weight of the plaintiff (approximately 200 pounds) on the fifth step because the stress on that particular point was insignificantly low. Dr. Burdette countered the opinions of Dr. Lyon and Beard, who both required Gallien to still be on the ladder applying the load at the time the ladder made contact with the grating, as follows:
That ladder by itself falling from an upright position, particularly when somebody in the process of falling gets some dynamics and kicks it over, the ladder's weight by itself would break that leg by falling over and hitting at an angle of twenty-two (22) degrees.... He didn't have to be on it, in other words, at that point. The accident had already happened. He might very well be off the ladder when the failure occurred[.]
In other words, the weight of the ladder coupled with the dynamic force caused by Gallien's escape was sufficient to break the ladder at the time it came in contact with the grating.
After hearing testimony by the other experts concerning whether a pipe restricted the ladder from reaching one of the larger openings in the grating, Dr. Burdette testified that he went out to the accident site the night before he testified and discovered that if the ladder was not perfectly aligned, but instead rotated a few degrees ("no more than five or ten degrees at most"), the ladder rail fit into the hole. Accordingly, Dr. Burdette was still of the opinion that the ladder most likely broke on account of slipping into a hole in the grating, most probably one of the larger openings. Lastly, Dr. Burdette testified that you cannot tell where a piece of wood will break and that with each piece that point can vary greatly. As such, Dr. Burdette was not concerned that the point the ladder pinched the metal grating was not the point of the break. Also, like Dr. Winistorfer, Dr. Burdette ruled out the possibility of an internal defect because a ladder providing faithful service for three months does not "[a]ll of [a] sudden ... brea[k]. Something was different." Dr. Burdette concluded that this difference was the ladder rail slipping into a hole and tipping over causing it to break.
To the contrary, Dr. Lyon, after being recalled to the witness stand, testified that he believed that a piece of wood will consistently break at its point of maximum stress.
It is clear that, after examining the record in its entirety, the trial court erred in granting Gallien's motion for a JNOV. In the case sub judice, the facts and inferences do not point so strongly and overwhelmingly in favor of one party that reasonable men could not arrive at a contrary verdict. See Anderson, 583 So.2d 829. We so find given the undisputed facts that: (1) the left back ladder rail could fit through the larger holes in the grating as well as the smaller diamond shaped openings if placed at certain angles; (2) all experts admitted that the rail slipping into a hole was one of four possible theories of what caused the ladder to suffer a bending failure; and, (3) experts reached opposite opinions based on the evidence and well-founded presumptions. In sum, a reasonable juror could reach the conclusion that the ladder had or had not gone through an opening in the grate. Therefore, we conclude that the jury, as reasonable people in the exercise of impartial judgment, could have reached different conclusions, thereby *1279 making a JNOV inappropriate. We further note that, for the identical reasons as stated above, a JNOV in favor of Stapleton Corporation would be equally inappropriate.

The Jury Interrogatory
We next turn to the special jury verdict form. Stapleton Corporation contends that the trial judge erred in his instructions to the jury and that the special jury verdict form was confusing and misleading.
In this case, there was some confusion surrounding interrogatory number two on the jury's special verdict form. First, we note that, as correctly observed by the jury foreman, interrogatory number two actually contained two distinct questions for the jury to decide. During the deliberation process the judge was asked to interpret the intended meaning of interrogatory number two and to clarify its wording. However, the trial court's clarification did not eliminate the compound nature of the question. In fact, the trial judge, in his attempt to clarify the language, made changes which essentially reversed the meaning of the second part of the question from that which was originally provided on the jury's special verdict form. As clarified by the judge, the jury was asked to determine: (1) whether there exists an alternative design that was capable of preventing the damage; and, if so, (2) whether it would have been prohibitively expensive to adopt the alternative design. See La.R.S. 9:2800.56.
The original drafting of interrogatory number two, to which the jury was asked to answer a simple yes or no, provided:
2. At the time the ladder left the defendant's control, did there exist an alternative design for the ladder that was capable of preventing the damage suffered by James Roy Gallien and Patricia Gallien, if any; and, if so, did the likelihood that the ladder's design would cause the damage and the gravity of that damage outweigh the burden on the defendant of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the ladder? (Emphasis added).
The modified interrogatory number two, as penned by the trial judge, asked the jury to answer yes or no to the following:
2. At the time the ladder left the defendant's control, did there exist an alternative design for the ladder that was capable of preventing the damage suffered by James Roy Gallien and Patricia Gallien, if any; and, if so, would it have been prohibitively expensive and inconvenient to do so. (Emphasis added).
When the second or revised version of interrogatory number two is employed, by requiring a simple yes or no answer, the special jury verdict form does not contemplate all possible responses. A jury could answer the two questions contained in the one interrogatory: no-not applicable, yes-yes, or yes-no. The possible answers to the interrogatory that the jury ultimately was asked to respond to have the following effects: a no-not applicable or a yes-yes response by the jury equates to a verdict in favor of Stapleton Corporation, whereas, a yes-no response equates to a verdict in favor of Gallien. Considering the compound nature of the interrogatory coupled with the special jury verdict form requiring a simple yes or no response, we find this interrogatory fatally defective. This fatal defect constituted a legal error which interdicted the jury's fact finding process. See Ferrell v. Fireman's Fund Ins. Co., 94-1252 (La.2/20/95); 650 So.2d 742. As such, we conduct a denovo review of the record to determine whether the ladder's design was unreasonably dangerous.[8]
*1280 After a thorough examination of the evidence presented at trial, we conclude that Gallien did not meet his burden of proving that the ladder manufactured by Stapleton Corporation was unreasonably dangerous in design. The only evidence presented at trial regarding the proposition that this ladder was defective in design concerned the addition of "mud blocks" to the end of each ladder rail. Robert Lansing, president of Stapleton Corporation, testified that mud blocks reinforce the area above the bottom front step and rear horizontal rivet by providing a larger base. Lansing further testified that, at the time of the accident, mud blocks were available upon special order, as was the common practice among ladder manufacturers. It was never insinuated at trial that mud blocks should be or are a standard feature. To the contrary, a catalog from R.D. Werner Co., Inc., a competing ladder manufacturer, which was admitted into evidence, supported the view that mud blocks are considered an option in the industry, not a standard feature. Furthermore, the evidence proved that Stapleton Corporation actually added an additional cross brace and constructed the rails a little wider than ANSI standards to increase strength and stability. None of this proves a design defect.
Therefore, because the jury found that the ladder was not defective in composition and we find that the ladder was not defective in design, Stapleton Corporation is entitled to judgment, as a matter of law, dismissing James and Patricia Gallien's claims with prejudice.
Accordingly, we reverse the trial court's judgment and render judgment in favor of defendant, Stapleton Corporation, against plaintiffs, James and Patricia Gallien. Lastly, because we have reviewed the record and find it adequate to render judgment, we conclude that a new trial is unnecessary. See La.Code Civ.P. art. 1811(C)(2). As such, we render judgment and reverse the trial court's grant of a conditional new trial.
As our determination of Stapleton's first two assignments of error are dispositive of the case, we pretermit discussion of Stapleton Corporation's remaining assignment.

DECREE
The trial court's judgment is reversed, and a judgment in conformity with the law is rendered. Accordingly, it is hereby ordered, adjudged and decreed that judgment is rendered in favor of defendant, Stapleton Corporation, and against plaintiffs, James and Patricia Gallien, dismissing plaintiffs' demands with full prejudice. All costs are assessed to the plaintiffs-appellees, James and Patricia Gallien.
REVERSED AND RENDERED.
NOTES
[1] The measurements of the diamond shaped openings were 3.177" ×. 1.503" ×. 0.940".
[2] Prior to the defendant having an opportunity to examine the broken ladder, a piece of the ladder that was alleged to still be attached was sawed off. Every person involved in this action denies knowledge of what happened to the piece, and its whereabouts were still unknown at the time of trial.
[3] This possibility was summarily dismissed by each expert. The evidence presented at trial provided that the ladder was well maintained and evidenced normal wear and tear for a three month old wooden ladder used in a like manner.
[4] Dr. Lyon defined compression wood as follows:

Compression wood is a abnormal type of wood material that grows in soft wood species like southern pine [the material used to make the ladder in question].
[5] Wane is missing material or bark.
[6] In his testimony, Dr. Lyon admitted that on account of the time that had passed between the date of the accident and the time the ladder was examined by an expert, it was impossible to determine whether the ladder suffered a compression failure.
[7] Gallien testified that he jumped from the ladder at approximately 45°. Gallien further testified that he was unaware that the rail had broken during the accident. As such, it was not necessary to assume Gallien was still on the ladder at the time the ladder rail broke.
[8] We note that there were no complaints concerning the form and content of interrogatory number one. Interrogatory number one, to which the jury responded "No", provided:

1. At the time the ladder left the defendant's control, did it deviate in a material way from the manufacturer's specifications or performance standards for the product or from otherwise identical products manufactured by the same manufacturer?
We find this interrogatory to be legally sufficient and, therefore, this issue settled. Accordingly, the jury's factual finding that the ladder was not unreasonably dangerous in construction or composition under La.R.S. 9:2800.55 is final.